UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| SCOTT BAUER, | ) | CR. 05-50016-02-AWB |
| | ) | [CIV. 07-5062] |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | REPORT AND |
| | ) | RECOMMENDATION |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## INTRODUCTION

This matter is before the court pursuant to Mr. Bauer's motion to vacate, correct, or set aside his sentence under 28 U.S.C. § 2255.[1] [Docket 274]. The district court referred the issue of Mr. Bauer's allegations of ineffective assistance of counsel to this magistrate judge for an evidentiary hearing and a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## FACTS

An indictment was filed on March 17, 2005, charging Mr. Bauer with eight counts:  conspiracy to distribute methamphetamine, distribution of methamphetamine (3 counts), use of a firearm in the distribution of a

---

[1]Mr. Bauer's federal criminal case number is 5:05-cr-50016-02-AWB. When Mr. Bauer filed his § 2255 motion, a civil case file, 5:07-cv-5062-KES, was opened for statistical purposes only.  All proceedings with regard to Mr. Bauer's § 2255 motion are filed in his criminal case.

controlled substance (3 counts), and being a felon in illegal possession of a firearm.  On February 1, 2006, Mr. Bauer pleaded guilty to two counts of using a firearm in the distribution of a controlled substance.  As part of the plea agreement, the government dismissed the remaining six counts.  The government also made a motion for downward departure pursuant to U.S.S.G. § 5K1.1 on the basis of Mr. Bauer's cooperation with the government.

On May 11, 2006, Mr. Bauer was sentenced.  He was facing 30 years mandatory minimum incarceration for the two counts to which he pleaded guilty.  Although grounds for upward departure were noted in the presentence report ("PSR"), the government did not move for upward departure and the court did not depart upward.  Based on the government's 5K1.1 motion, the district court sentenced Mr. Bauer to 19 years and 2 months (230 months) incarceration, 5 years supervised release, and a $1,050 fine.

Mr. Bauer filed a notice of appeal to the Eighth Circuit.  The Eighth Circuit summarily dismissed the appeal on motion by the government pursuant to Eighth Circuit Rule 47A(b).  Apparently the dismissal was premised on Mr. Bauer having waived his right to appeal in the plea agreement.

On August 31, 2007, Mr. Bauer filed the present petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.  Mr. Bauer currently resides in a correctional facility operated by the Bureau of Prisons in Florence, Colorado.  Mr. Bauer raised three grounds for relief in his petition:

(1) the district court erred in treating counts nine and eleven of the indictment as separate and distinct offenses for purposes of sentencing; (2) his mental state rendered him unable to enter a guilty plea; and (3) his counsel's representation was constitutionally ineffective, alleging six specific deficiencies in performance.[2]

In a memorandum opinion dated March 20, 2008, the district court, the Honorable Andrew W. Bogue, Senior United States District Judge, dismissed grounds one and two on the merits, but indicated that it was "unable to conclude at this time that Petitioner's claim of constitutionally-deficient counsel must be dismissed." [Docket 285].  The referral to this magistrate judge followed.

As amended by Mr. Bauer orally at the hearing, he is asserting six bases for his ineffective assistance of counsel claim.  They are:

1.    His lawyer, Mr. John Murphy,[3] failed to adequately investigate Mr. Bauer's case by failing to review videotapes of Mr. Bauer's pre-indictment interviews with agents from the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), and from the Federal Bureau of Investigation ("FBI"), which videotapes would have documented

_____

[2]Mr. Bauer's written petition lists seven assertions of ineffective assistance of counsel.  At the hearing, Mr. Bauer voluntarily dismissed the final allegation, resulting in only six allegations being presented to this court.

[3]Mr. Bauer was initially represented by Robert Van Norman from March, 2005, until December, 2005.  Mr. Murphy represented Mr. Bauer from December 6, 2005, until May 31, 2006.  Mr. Bauer's ineffective assistance claims concern only Mr. Murphy's conduct.  Mr. Van Norman ceased representing Mr. Bauer when he closed his law practice and moved to Minnesota.

3

promises to Mr. Bauer that he would not be prosecuted if he cooperated with law enforcement.

2.     Mr. Murphy failed to ensure that Mr. Bauer received psychotropic medication, the absence of which resulted in Mr. Bauer's mental condition deteriorating.

3.     Mr. Murphy promised Mr. Bauer that, if he entered a plea of guilty, he would be eligible for a Bureau of Prisons ("BOP") drug treatment program that, upon successful completion, would reduce Mr. Bauer's sentence.  In fact, Mr. Bauer discovered post-sentencing that he was not eligible for sentence reduction on the basis of his participation in the BOP program because he pleaded guilty to offenses involving guns.

4.     Mr. Murphy failed to object to paragraph no. 77 of the PSR asserting as grounds for an upward departure that Mr. Bauer knew the guns which formed the basis of his guilty plea were stolen.  In fact, Mr. Bauer asserts that he did not know they were stolen until ATF agents told him that fact subsequently.

5.     Mr. Murphy failed to object to remarks made by the prosecutor at sentencing that Mr. Bauer was prosecuted because, after his initial contact with the ATF and the FBI, he relapsed into using drugs and probably sold drugs again.  Although Mr. Bauer admits to using drugs after his initial contact with law enforcement, he urges that he never again sold drugs.[4]

6.     Mr. Murphy failed to present mitigating evidence at sentencing in the form of letters of support from employers, friends, and family.

An evidentiary hearing on Mr. Bauer's ineffective assistance of counsel

claims was held on Friday, June 6, 2008.  Mr. Bauer appeared in person and

---

[4]In his *pro se* petition, Mr. Bauer also argues that Mr. Murphy was deficient because he failed to object to other comments by the prosecutor as to the quantity of drugs sold by Mr. Bauer and that Mr. Bauer was a leader in the drug conspiracy.  However, no evidence was introduced on these other comments by the prosecutor at the evidentiary hearing in this matter, so the court deems those arguments waived or unsupported by any evidence. Accordingly, they are not discussed in this report.

by his counsel, Assistant Federal Public Defender William Delaney, III.  The United States appeared by Assistant United States Attorney Mark Vargo.  Two witnesses testified at the hearing, Mr. Bauer and Mr. John Murphy, Mr. Bauer's lawyer during the last portion of the underlying criminal case.  In addition to the testimony and documents introduced at the hearing, the parties stipulated that the court could take judicial notice of the entirety of Mr. Bauer's criminal file, including the Presentence Report ("PSR").  From the evidence thus adduced at the hearing, the court finds the following facts.  For clarity, the facts are organized according to Mr. Bauer's assertions of ineffective assistance of counsel.

### 1.     Failure to Adequately Investigate

Mr. Bauer testified that he had been interviewed pre-indictment by ATF agent Derek Hill and FBI agent Dan Cooper.  He asserts that, during these interviews, Hill and Cooper promised him that he would not be prosecuted if he cooperated.  Mr. Bauer testified that he cooperated with law enforcement, but was prosecuted nonetheless.  He testified that these conversations with Hill and Cooper were videotaped.  He asserts that Mr. Murphy was ineffective for failing to review the videotapes.  Mr. Bauer did not introduce any videotapes at the evidentiary hearing in this matter.

Mr. Bauer testified extensively and in great detail at his sentencing hearing regarding his contacts with Agents Hill and Cooper and other law enforcement officers.  Although he testified about a particular phone call being

5

recorded in connection with a controlled buy, he never mentioned any other conversations with Hill, Cooper or anyone else being recorded.  <u>See</u> Sentencing Transcript at pages 13-30 [Docket No. 249].

Mr. Murphy testified that he served the government with a discovery request that included a request for videotapes.  He testified that the government did not turn over any videotapes in response to his discovery request, although he did receive numerous other documents and tangible physical evidence.  He reviewed all of this discovery with Mr. Bauer. Mr. Murphy testified that, if Mr. Bauer had alerted him to the existence of any videotapes, Mr. Murphy would have made further inquiry of the government. Mr. Murphy is not aware that any such videotapes exist.  Mr. Murphy does not recall Mr. Bauer ever telling him that any videotapes existed.  Furthermore, Mr. Murphy testified that, in his experience, federal law enforcement does not have a usual practice of recording interviews with cooperating defendants or witnesses.

Mr. Murphy also does not recall Mr. Bauer ever telling him that he received a promise that he would not be prosecuted at all.  Rather, Mr. Murphy remembers that Mr. Bauer expressed dissatisfaction that the plea offer that was made by the government was not as favorable as he had anticipated it would be.

Mr. Murphy acknowledged that Mr. Bauer had reverted to the use of illegal drugs after his initial cooperation with law enforcement.  Mr. Murphy said that, if there had been an agreement not to prosecute, Mr. Bauer's return to using drugs could have been a material breach of that agreement.  In fact, Mr. Bauer himself testified at his sentencing hearing that FBI Agent Cooper had specifically advised him to "stay clean and out of trouble" because if Bauer got caught doing anything illegal, Agent Cooper would be unable to help him.  See Sentencing Transcript at page 20 [Docket No. 249].

### 2.      Failure to Obtain Medication for Mr. Bauer

Mr. Bauer testified that he suffers from depression and that he has taken prescription Wellbutrin off and on for this condition.  Specifically, Mr. Bauer testified that he took Wellbutrin in 2001, then went off the medication in 2002, then began taking it again in 2004, then discontinued use of the drug, then began taking the drug again in September 2004, which he continued for a month.

Mr. Bauer was arrested on the charges for which he was indicted on March 23, 2005.  It appears that he was detained thereafter for the duration of his criminal case.[5]  In late May 2005, Mr. Bauer made a request through the Pennington County Jail where he was being detained to be placed on anti-

---

[5]Mr. Bauer made a motion to reconsider his detention on September 2, 2005, asking to be released, but the court denied the motion on September 14, 2005.

depressant medication.  He was afforded a consultation with a mental health expert and, apparently, no medication was thereafter prescribed.  There is no written record that Mr. Bauer ever renewed this request.

Mr. Bauer testified that without anti-depressant medication like Wellbutrin, he cried constantly, he could not focus, and he was unable to make any decisions of his own, but did only what his attorneys told him to do.  He testified that if he had been receiving proper medication during the pendency of his case, "things would have been different," though he did not specify how or what would have been different.  On cross-examination, Mr. Bauer conceded that his depression was not of such a nature that de did not know what was going on at sentencing.

Prior to Mr. Bauer entering his plea of guilty in this case, the district court asked him, under oath, whether he had been treated recently for mental illness of any kind.  See Plea Hearing Transcript at page 2 [Docket No. 248]. Mr. Bauer replied "no."  Id.

Mr. Murphy testified that, in his experience, most persons who are incarcerated suffer from mild depression or some other mental condition. Mr. Murphy testified that Mr. Bauer never asked Mr. Murphy to help him secure a prescription for Wellbutrin or any other drug.  Mr. Murphy indicated that the only statement Mr. Bauer made to him about Wellbutrin was that it

was easier for Mr. Bauer to refrain from using methamphetamine when he was taking Wellbutrin.

Mr. Murphy indicated that it is his habit to explore the mental issues of his clients where he believes there may be a problem.  In general, he talks extensively with his clients, asks them to repeat back things Mr. Murphy has told them, and observes them to determine if further mental evaluation by a professional or medicine is needed.  Mr. Murphy testified that he never observed anything in his interactions with Mr. Bauer that indicated to him there was a mental problem that needed to be addressed.  Mr. Bauer appeared reasonably intelligent, alert, and oriented to his surroundings.  He exhibited an understanding of what was going on with the court proceedings.   Therefore, Mr. Murphy did not pursue any further exploration of Mr. Bauer's mental health or whether he needed medication.  The requests Mr. Bauer made through the jail for medication were made some six months before Mr. Murphy began representing Mr. Bauer.  No evidence was introduced at the hearing that Mr. Murphy was ever aware that Mr. Bauer had made these requests to the jail.

### 3.    Eligibility for Sentence Reduction Through BOP Program

Mr. Bauer testified that Mr. Murphy promised him that he could enroll in a BOP drug treatment program after he was incarcerated.  Further, Mr. Bauer testified that Mr. Murphy told him that if he successfully completed the program, it would reduce his term of imprisonment by one year.  Mr. Bauer

testified that, had he known in advance that he was not eligible for this method of sentence reduction, it would have affected his decision to plead guilty.

Mr. Murphy testified that he never promises any of his clients anything with regard to BOP programs.  Mr. Murphy testified that it has been his experience that BOP programs change all the time, and are enforced in different ways in different facilities, all of which contribute to an inability to predict what the BOP's policy might be in a given case.  He testified that he may have mentioned the drug program and alerted Mr. Bauer to investigate it further upon his incarceration, but that he never made any promises as to whether the program would affect Mr. Bauer's sentence.  In fact, Mr. Murphy said he would not have ever made such a promise to Mr. Bauer because, in his experience, gun offenders and defendants convicted of violent offenses are not eligible for sentence reduction due to participation in BOP drug programs.

###     4.     Failure to Object to Paragraph No. 77 of the PSR

Paragraph no. 77 of the PSR was part of Section E of the PSR detailing factors that may warrant departure from the sentencing range under applicable United States Sentencing Guidelines.  Paragraph no. 77 provided in its entirety as follows:

> 77.   Pursuant to USSG § 5K2.21, <u>Dismissed and Uncharged Conduct</u> (Policy Statement), the Court may consider an upward departure to reflect the actual seriousness of the offense based on conduct (1) underlying a charge dismissed as part of a plea agreement in the case, or underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter

10

> into the determination of the applicable guideline range.  In
> this case, the defendant possessed firearms he knew were
> stolen, and he was a prohibited person at the time of the
> offense.  He also admitted to agents that he traded
> methamphetamine for other firearms in addition to those in
> this offense.

See PSR at page 17.

Mr. Bauer testified that Mr. Murphy never objected to paragraph no. 77 of the PSR.  Mr. Bauer testified that he told Mr. Murphy that he never knew the guns he possessed were stolen until AFT agent Derek Hill told him so long after he came into possession of the guns.  However, Mr. Bauer admitted on cross-examination that he knew Rae Anne Ponce was a woman of very little financial means, that she was not a federally licensed firearms dealer, that she repeatedly brought Mr. Bauer expensive firearms which she traded to him to obtain methamphetamine, and that Mr. Bauer's suspicions that the guns were stolen were alerted at least to the point that he questioned Ms. Ponce about whether the guns were stolen.

Mr. Murphy testified that Mr. Bauer told the probation officer during his interview for the PSR that he never knew the guns were stolen until afterward.  However, Mr. Murphy also indicated that he had received in discovery from the government a report from ATF Agent Hill indicating that Mr. Bauer did in fact

11

know that at least one gun he had possessed was stolen.[6]  Furthermore,

Mr. Murphy testified that the government was not required to prove that

Mr. Bauer knew the guns to be stolen in order to enhance his sentence based

on the status of the guns being stolen.

Nevertheless, Mr. Murphy filed a written objection to paragraph no. 77

objecting to the upward departure.  Mr. Murphy's objection, as recorded in the

PSR, was as follows in its entirety:  "In reference to paragraph 77 of the PSR,

the defendant maintains that an upward departure based on Dismissed and

Uncharged Conduct is not applicable."  See PSR, Addendum 2.

The sentencing range for Mr. Bauer was 60 months on Count 9 and 300

months on Count 11, to run consecutively, for a total of 360 months

incarceration.  The district court did not depart upward from this sentencing

range pursuant to paragraph no. 77 of the PSR or any other paragraph

outlining possible grounds for upward departure.  Instead, the court granted

the government's motion for downward departure based on Mr. Bauer's

cooperation and USSG § 5K1.1.  See Sentencing Transcript at page 11-12

[Docket No. 249].

---

[6]Mr. Murphy's recollection of the report was that Agent Hill and
Mr. Bauer were discussing the whereabouts of a particular shotgun, which
Mr. Bauer said was in the possession of a friend in Black Hawk or Piedmont,
South Dakota.  When Agent Hill pressed Mr. Bauer for the name of this friend,
Mr. Bauer declined to reveal the friend's name, saying that he did not want to
involve his friend because the friend had had no idea the shotgun was stolen.
Agent Hill wrote that Mr. Bauer indicated his knowledge that the shotgun was
stolen before Agent Hill himself revealed anything about the gun being stolen.

Upon pronouncing sentence, the district court did not mention paragraph no. 77 of the PSR or the allegations contained therein.  Instead, the court stated that the two facts which most influenced her sentence were the fact that Mr. Bauer had a daughter whom he had deeply disappointed by his continued involvement with drugs and the fact that Mr. Bauer had prior criminal convictions for distributing marijuana and distributing methamphetamine.  <u>Id.</u> at 33-35.  The prior convictions showed that Mr. Bauer had been involved with the drug trade for a very long period of time and had received prior warnings about what would happen if he continued to be involved with dealing drugs, including the fact that Mr. Bauer had previously received a sentence of imprisonment of 41 months for the earlier methamphetamine conviction.  <u>Id.</u>

The district court acknowledged Mr. Bauer's cooperation, but stated that it was no more noteworthy than most cooperating defendants provided.  <u>Id.</u> at 36-37.  The court also emphasized that Mr. Bauer's activities involved not just distributing drugs, but mixing guns and drugs, which the court found to be a dangerous combination.  <u>Id.</u> at 35.  The district court said nothing about whether the guns were stolen, only that "any time that drugs and guns are together, the potential for very serious injury and death is always there."  <u>Id.</u> The actual sentence imposed by the district court was 230 months

incarceration total on both Counts 9 and 11.  See Judgment and Commitment, Docket No. 235.

### 5.    Failure to Object to Prosecutor's Remarks at Sentencing

The prosecutor at sentencing argued that Mr. Bauer, although he had cooperated with law enforcement, was charged with crimes in the indictment because "after his initial contacts with law enforcement, . . . he went back to the use of meth.  He got back into that world not as an informant, but as a user, and I suspect, given the price of his habit, as a supplier."  See Sentencing Transcript at page 31-32 [Docket No. 249].  Mr. Bauer admits that he had a relapse and used methamphetamine after his initial cooperation with law enforcement, but argues that he never again sold drugs, that he told Mr. Murphy this information, but that Mr. Murphy did not object to the prosecutor's remark at sentencing.  For this failure to object, Mr. Bauer faults Mr. Murphy.

Mr. Murphy testified that the prosecutor's remarks were argument and that he did not object because he did not think the remarks were pertinent and because he felt the remarks were at least partially accurate.  Mr. Bauer had testified to having a $400-a-day methamphetamine habit.  See Sentencing Transcript at page 29 [Docket No. 249].  The supposition that Bauer "probably" resorted to selling drugs in order to support his use–which use he admitted–was not improbable, according to Mr. Murphy.

14

### 6.    Failure to Present Mitigating Evidence at Sentencing

Mr. Bauer testified that no letters of support from employers, family, or friends were submitted for the court's reference at his sentencing. Mr. Bauer faults Mr. Murphy for this, although he admits he never talked to Mr. Murphy about this prior to sentencing.  Mr. Bauer testified that he was not sure what employers, family, and friends would have testified to at sentencing, but then suggested that a whole host of laudatory qualities would have been placed into the record if Mr. Murphy had sought letters from these people.

One thing Mr. Bauer testified that he thought would have been said about him was that he was good to his grandkids.  He then admitted, on cross-examination, however, that one of his grandkids was frequently in the home of Rae Anne Ponce, a person to whom Mr. Bauer frequently sold methamphetamine.

Mr. Murphy acknowledged that no letters of support from employers, family or friends was submitted at sentencing, but objected that he did not present evidence of mitigation.  Mr. Murphy's strategy at sentencing was to emphasize Mr. Bauer's cooperation with law enforcement as the primary mitigating factor.  Mr. Murphy clearly communicated this tactic in a letter to Mr. Bauer prior to sentencing.  Mr. Murphy outlined 15 points with regard to Mr. Bauer's cooperation that he planned to make on Mr. Bauer's behalf at sentencing, such as the number of names Mr. Bauer had given law enforcement, his satisfactory testimony before a grand jury, and so on.

15

Mr. Murphy worked with Mr. Bauer before his sentencing on what Mr. Bauer would say in his allocution, stating that he felt this was one of the most significant ways to present mitigation evidence in Mr. Bauer's favor. Mr. Murphy testified that there was a lot of things Mr. Bauer wanted to say. Mr. Murphy tried to steer him away from talking about things that would hurt his chances of getting a good sentence, but ultimately, the decision about what to say rested with Mr. Bauer.  Mr. Murphy testified that Mr. Bauer's allocution was perhaps the longest Mr. Murphy had ever seen a criminal defendant give. In it, Mr. Bauer talked at length and in detail about his addiction, his cooperation with the authorities, and the fact that he did not know the guns he received from Rae Anne Ponce were stolen.  He stated that Agent Hill had promised him that he would not be prosecuted.

Mr. Murphy testified that it is his usual practice to contact persons who might be asked to submit letters portraying a client in a sympathetic light at sentencing.  Mr. Murphy could not recall if he did that in Mr. Bauer's case. Mr. Murphy did recall that the two people Mr. Bauer identified as being the closest to him were a brother who was incarcerated on drug charges at the time of Mr. Bauer's sentencing, and a girlfriend who was away in an inpatient drug treatment program at the time.  These two individuals did not appear at the hearing nor did they submit letters.  However, Mr. Bauer's father did testify; he

16

asked the court to show his son leniency.  <u>See</u> Sentencing Transcript at page

30-31 [Docket No. 249].

Mr. Murphy testified that Mr. Bauer's case was one with "a lot of

negatives":  Mr. Bauer had prior criminal history, the charges he was facing

were very serious, and there were applicable mandatory minimum sentences

for some of the crimes.  Accordingly, Mr. Murphy testified that his strategy at

sentencing was to emphasize the one aspect of the case that could not be

characterized as bad or undermined by contrary evidence and the only factor

that could take Mr. Bauer's sentence outside the statutory mandatory

minimum sentences:  Mr. Bauer's cooperation.  Mr. Murphy agreed that

quibbling over side issues that were not clear-cut issues in Mr. Bauer's favor

might result in painting a less flattering picture of Mr. Bauer than focusing

exclusively on his cooperation.

**DISCUSSION**

**A.    Legal Standard Applicable to Ineffective Assistance Claims**

The Sixth Amendment of the Constitution of the United States affords a

criminal defendant with the right to assistance of counsel.  U.S. Const. amend.

VI.  The Supreme Court "has recognized that 'the right to counsel is the right to

effective assistance of counsel.' "  <u>Strickland v. Washington</u>, 466 U.S. 668, 698

(1984) (citing <u>McMann v. Richardson</u>, 397 U.S. 759, 771, n.14 (1970)).

<u>Strickland</u> is the benchmark case for determining if counsel's assistance was

so defective as to violate a criminal defendant's Sixth Amendment rights and

17

require reversal of a conviction.  Id. at 687.  "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness."  Id. at 687-688.  The defendant must also show that counsel's unreasonable errors or deficiencies prejudiced the defense and affected the judgment.  Id. at 691.  The defendant must show, "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.  In sum, a defendant must satisfy the following two-prong test.  Id. at 687.

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id.

"There is a presumption that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment."  Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir. 2002).  It is the petitioner's burden to overcome this presumption, and a "petitioner cannot build a showing of

prejudice on a series of errors, none of which would by itself meet the prejudice test." Id.  Judicial scrutiny of attorney performance is highly deferential, with a strong presumption that counsel's conduct falls within the range of reasonable professional conduct.  Strickland, 466 U.S. at 698.

**B.    Application of <u>Strickland</u> Standard to Mr. Bauer's Claims**

**1.    Failure to Adequately Investigate By Obtaining Videotapes of Mr. Bauer's Pre-Indictment Interviews With Law Enforcement**

The court makes a specific finding of fact that the alleged videotapes do not exist.  There is simply no reliable evidence of their existence.  Mr. Murphy asked for them in discovery and received nothing.  It is not the practice among federal law enforcement in the Western Division of the District of South Dakota to make such recordings of cooperation discussions.  Mr. Bauer did not testify that such videotapes existed at his sentencing hearing, although given the breadth and depth of his sentencing allocution, one would certainly have expected him to have discussed the videotapes if they existed.  Finally, Mr. Bauer did not introduce the videotapes into evidence at the hearing on the instant petition.  The only evidence of their existence is Mr. Bauer's self-serving testimony at the hearing in this matter, which the court does not find credible.

Because there is no evidence that any videotapes of Mr. Bauer's conversations with law enforcement exist, Mr. Murphy's representation of Mr. Bauer can in no way be considered deficient for having failed to obtain and view these nonexistent tapes.

19

### 2.   Failure to Ensure that Mr. Bauer Received Psychotropic Medication While Being Detained Pre-Trial

Mr. Bauer alleges that his lawyer was ineffective for failing to obtain the antidepressant medication Wellbutrin for him pre-trial.  Mr. Bauer does not allege that he suffered from a mental disease or defect that would provide an overlooked defense to the criminal charges he faced.  Rather, Mr. Bauer claims that, had he received Wellbutrin, his decision-making capability as to whether to enter into the plea agreement would have been "different."  No expert medical or psychological testimony was introduced in support of Mr. Bauer's claim.  Mr. Bauer did not testify that, had he been medicated, that he would not have decided to plead guilty.

The single case cited by Mr. Bauer in his post-hearing brief in support of this contention, <u>Parkus v. Delo</u>, 33 F.3d 933 (8th Cir. 1994), is entirely distinguishable.  In that case, the habeas petitioner, Parkus, had an extensive history as a mentally disturbed man who has been raised in state institutions since the age of four.  <u>Id.</u> at 934.  He was convicted of first-degree murder and received the death penalty.  <u>Id.</u>  During his state court proceedings, his counsel had made a request for Parkus' childhood mental health records, but was told by the records custodian that the records had been destroyed.  <u>Id.</u> at 936.  As a result, a psychiatrist who testified as Parkus' expert at trial and at the death penalty phase was unable to testify that Parkus suffered from a mental disease or defect.  <u>Id.</u>

During habeas proceedings, however, Parkus was able to obtain his childhood mental health records (which had not, in fact, been destroyed) and, from those records, Parkus' trial psychiatrist submitted an affidavit attesting that he could now reach the opinion that Parkus suffered from a mental disease or defect.  Id.  The district court refused to grant an evidentiary hearing to Parkus.  Id. at 937.  On appeal to the Eighth Circuit, the court declined to reach the merits of whether Parkus was entitled to habeas relief on his claim that his trial counsel was ineffective due to his failure to obtain the childhood records, but did decide that the evidence adduced entitled Parkus to an evidentiary hearing on his petition.  Id. at 939-940.  The court emphasized that its ruling was based on the "compelling and unusual" circumstances presented regarding Parkus' mental health history, the fact that evidence that Parkus suffered from a mental disease or defect had the potential to relieve Parkus of criminal responsibility, and that the case involved the death penalty and, thus, affording the petitioner an evidentiary hearing was "particularly important."  Id. at 939 n.6.

In this case, Mr. Bauer has already been afforded the relief that the Eighth Circuit held Parkus was entitled to:  an evidentiary hearing.  Based on the evidence adduced at that hearing, the court concludes that Mr. Bauer is not entitled to relief.  First of all, no expert evidence or lay evidence was introduced to support a contention that Mr. Bauer was not competent to enter

21

a plea.  All the evidence adduced points, in fact, to the opposite conclusion. Prior to his indictment, when Mr. Bauer had the free will to choose to take Wellbutrin or not, he elected for lengthy periods of time not to take the medication.  His history of taking Wellbutrin was sporadic, at best.  One can also infer that this issue was not of the foremost importance to Mr. Bauer during his pretrial detention from the fact that he never mentioned to Mr. Murphy that he wanted to take Wellbutrin or that he had made an unsuccessful attempt to obtain that medication six months prior to Mr. Murphy assuming representation of Mr. Bauer.

In addition, both Mr. Murphy and the district court explored Mr. Bauer's mental acuity and understanding and neither found Mr. Bauer wanting in that department.  There is no evidence to suggest that Mr. Bauer was not competent to enter a plea of guilty.  The facts presented in this case are a far cry from the facts presented in Parkus, where the defendant had been sexually abused, abandoned, institutionalized, medicated, and diagnosed with serious mental diseases and defects from the age of four.  Parkus, 33 F.3d at 934-936.  The court concludes that Mr. Bauer has not shown that his counsel was ineffective for failing to obtain Wellbutrin or some other antidepressant for Mr. Bauer. Furthermore, the court concludes that Mr. Bauer has not shown prejudice for this alleged defalcation.

### 3.    Giving Erroneous Advice that Mr. Bauer Would Be Eligible for the Bureau of Prison's Intensive Drug and Alcohol Program

With regard to the evidence presented at the hearing, the court specifically credits the testimony of Mr. Murphy and discredits the testimony of Mr. Bauer. Mr. Murphy's reasons for believing that he would never have told Mr. Bauer that he could reduce his sentence through participation in the BOP program ring true to the court: BOP policies are subject to frequent changes and may be implemented differently in various BOP facilities. Furthermore, Mr. Murphy's statement that he knew gun offenders were typically *not* eligible for sentence reduction through the BOP drug program also supports his testimony that he would not have stated something contrary to Mr. Bauer. Finally, Mr. Murphy has no motive to fail to testify truthfully on this issue. The court found Mr. Murphy's testimony to be very candid in all respects. Where he had no specific recollection of a fact or conversation, he readily admitted so.

On the other hand, Mr. Bauer does have reasons for fabricating evidence or, at the least, viewing past events through favorable lenses–so that he can vacate or reduce his sentence. Mr. Bauer's testimony at the evidentiary hearing in this case is also undermined by the fact that he has previously given contrary testimony under oath at his plea hearing. At his plea, the following exchange took place between Mr. Bauer and the district court:

Court:      Did you have a chance to read and discuss that plea agreement with Mr. Murphy before you signed it?

Bauer:      Yes, I did.

23

| | |
|---|---|
| Court: | Do you understand all the terms and conditions of your plea agreement? |
| Bauer: | Yes.  He explained them to me. |
| Court: | Does the plea agreement represent all the promises that you have received from the government? |
| Bauer: | Yes. |
| Court: | Has the government promised you anything other than what's in your plea agreement to try to get you to plead guilty today? |
| Bauer: | No. |
| Court: | Has **anybody** made **any other promises or assurances** to you of any kind other than what's in your plea agreement? |
| Bauer: | No. |

See Transcript of Plea Hearing at pages 4-5 [Docket No. 248] (emphasis

supplied).  The written plea agreement in this case contains no representation

about Mr. Bauer's eligibility for any BOP drug treatment program or the effect

that successfully completing that program would have on Mr. Bauer's

sentence.  See Plea Agreement [Docket No. 205].  Thus, on an earlier occasion,

Mr. Bauer testified under oath essentially that no other promises were made

other than those contained in the plea agreement, and that would include the

alleged "promise" he urges the court to credit in his current motion.

The court has no doubt that Mr. Murphy mentioned the BOP drug

treatment program to Mr. Bauer.  Mr. Bauer's history obviously demonstrates

24

that he is in need of such treatment, whether it would result in a change to his sentence or not.  The court does not credit Mr. Bauer's testimony that Mr. Murphy *promised* him he could thereby reduce his sentence by participating in the program.  The court recommends that habeas relief based on this allegation be denied.

### 4.    Failure to Object to Paragraph No. 77 of the PSR

Mr. Bauer must demonstrate not only that his lawyer's performance was constitutionally deficient in failing to object to paragraph no. 77, but also that he was prejudiced thereby.  Strickland,  466 U.S. at 687-688, 691.  Mr. Bauer fails both prongs.  First, contrary to Mr. Bauer's assertion, Mr. Murphy *did* object to paragraph no. 77 of the PSR.  The fact that Mr. Murphy did not embellish upon his objection at sentencing is understandable:  the district court assured both parties at the outset of the hearing that she did not intend to depart upward based on paragraph no. 77.  See Sentencing Hearing Transcript at page 3 [Docket No. 249].  Thus, there was no need to discuss this paragraph, or Mr. Murphy's objection to it, any further.

Secondly, however, Mr. Bauer cannot show prejudice.  Paragraph no. 77 was offered up in support of a potential upward departure.  The district court did not depart upward.  Furthermore, there is no evidence that paragraph no. 77 had any carry-over "contamination" in the below-guidelines sentence that Mr. Bauer actually received.  The district court explained at length the reasons why she was imposing the sentence she imposed.  The "fact" that the guns

25

Mr. Bauer possessed were *stolen* were not among any of the reasons the court discussed in support of her sentence.  The court recommends that Mr. Bauer's request for relief on this basis be denied.

### 5.      Failure to Object to Prosecutor's Remarks at Sentencing

Mr. Bauer argues that Mr. Murphy was ineffective for failing to object to the prosecutor's remark at sentencing suggesting that Mr. Bauer's relapse into *using* methamphetamine after his initial cooperation with the government also probably resulted in Mr. Bauer *selling* meth again.  In his post-hearing brief, Mr. Bauer cites no legal authority at all in support of this proposition.  Local Rule 7.1 requires that written briefs in support of every motion be filed, and that those briefs contain legal authority in support of the party's argument. See DSD L.R. 7.1.  Mr. Bauer's failure to support his argument with any legal authority can be seen as a concession that his position is not supported in the law.

Nevertheless, instead of deeming the issue waived, the court will resolve it on the merits.  Based on Mr. Murphy's testimony at the hearing as set forth above, this is precisely the strategic sort of decision that is well within counsel's province to make under Strickland.  See Strickland, 466 U.S. at 698; Hall, 296 F.3d at 692.  Mr. Murphy did not fail to realize that he *could* object to the prosecutor's remark.  Rather, given how close to the known truth the prosecutor's supposition was, Mr. Murphy *elected* as a matter of strategy not to object to the remark, thereby avoiding potentially "digging a deeper hole" for

Mr. Bauer by inviting actual proof from the government about the exact nature and details of Mr. Bauer's relapse.  The court recommends denial of habeas relief to Mr. Bauer based on this assertion of ineffective assistance of counsel.

### 6.   Failure to Present Mitigating Evidence at Sentencing

There is no evidentiary dispute to resolve here, except one of semantics. Both Mr. Murphy and Mr. Bauer agree that no letters of support were presented in mitigation at Mr. Bauer's sentencing.  Only Mr. Bauer's father testified at the hearing.  Evidence of mitigation was presented in the form of emphasizing Mr. Bauer's cooperation.  Mr. Murphy testified that it was his strategy at sentencing to emphasize Mr. Bauer's cooperation so as to avoid focusing the court's attention on other, less flattering aspects of the case that could prejudice Mr. Bauer.

As noted above, "[t]here is a presumption that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment."  Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir. 2002).  It is the petitioner's burden to overcome this presumption, and a "petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test."  Id.  Judicial scrutiny of attorney performance is highly deferential, with a strong presumption that counsel's conduct falls within the range of reasonable professional conduct.  Strickland, 466 U.S. at 698.

In <u>Hall v. Luebbers</u>, 296 F.3d 685, 696-697 (8th Cir. 2002), the defendant alleged ineffective assistance of counsel because his lawyer had not presented testimony or letters from his father and two brothers in mitigation at his sentencing.  The court found no ineffective assistance of counsel where two mitigating witnesses, one of which was Hall's son, did testify at sentencing that Hall was a kind, decent person, and the witnesses who had not been called would have given similar testimony.  <u>Id.</u>  Hall, unlike Mr. Bauer in the present case, presented testimony from the three uncalled witnesses at his habeas evidentiary hearing who testified that, had they been called at witnesses at Hall's sentencing, would have testified that Hall was a kind, playful teenager who grew up in a tough neighborhood and who did not learn who his real parents were until he was an adult.  <u>Id.</u>

The <u>Strickland</u> case involved a claim identical to Mr. Bauer's:  a defendant who had pleaded guilty to three capital murders claimed that his trial counsel was ineffective for failing to present character witnesses in mitigation on his behalf at the sentencing phase of his case.  <u>Strickland</u>, 466 U.S. at 675.  In support of his petition for habeas relief, Strickland presented 14 affidavits from friends, neighbors, and relatives stating that they would have testified at the sentencing if asked to do so and that they would have said that Strickland was a good person who was worried about his family's financial problems at the time the crimes were committed.  <u>Id.</u> at 675-677.  The Court

28

found that Strickland had both failed to show that his counsel's performance fell below objectively reasonable standards and failed to show that failure to present character witnesses prejudiced him. Id. at 698-701.

With respect to whether Strickland's counsel's performance was deficient, the Court noted that the record showed counsel had made a strategic choice to emphasize Strickland's acceptance of responsibility as the primary mitigating sentencing factor. Id. at 699. That strategy choice, the Court noted, "was well within the range of professionally reasonable judgments." Id. By restricting the character evidence to what Strickland himself had said at his plea hearing, the Court noted that Strickland's counsel ensured that contrary character evidence would not be offered by the government at sentencing. Id. The Court concluded that trial counsel's strategy, even though unsuccessful, "was the result of reasonable professional judgment." Id.

Even assuming that Strickland could show that his counsel's performance fell below the standard of reasonableness, however, the Court also held that Strickland could not demonstrate prejudice. Id. at 699-701. The Court noted that there were overwhelming aggravating factors, and the relatively weak testimony of people who knew Strickland that he was "generally a good person" would not have outweighed the aggravating factors. Id. at 700. Indeed, the Court noted the possibility that the introduction of such character evidence may have actually hurt Strickland's case, rather than helped, because

29

it would have allowed the government to introduce more aggravating evidence to contradict this character evidence.  Id.

It is noteworthy that Mr. Bauer, unlike the petitioners in Hall and Strickland, produced no friends, family, or employers at the evidentiary hearing in this case to testify as to what they would have said about him had they been called upon to testify at sentencing or submit letters for sentencing.  Neither did Mr. Bauer present affidavits from any of these people. Mr. Bauer's father *did* testify, and he said none of the things Mr. Bauer indicated at the hearing in this matter would have been said by others.  The only evidence offered on this issue was Mr. Bauer's own self-serving testimony about what others would have said about him at sentencing.  However, even Mr. Bauer backed away from his own laudatory testimony about himself when confronted on cross-examination with some of his unsavory treatment of his own family.  The court finds less than credible Mr. Bauer's testimony on the issue of what others would have said about him in mitigation at sentencing.

Furthermore, the purported testimony these uncalled witnesses would have allegedly provided was cumulative to the testimony Mr. Bauer's father did in fact provide at sentencing.  Also, there is every reason to believe that the uncalled witnesses would have faltered in their praise of Mr. Bauer when confronted with his conduct in this case, because even Mr. Bauer himself so faltered in the face of the facts.  In addition, as in the Strickland case, the

30

introduction of mitigating character witnesses by Mr. Bauer at sentencing would have opened the door to a host of aggravating character witnesses in response by the government.  Finally, the evidence of Mr. Bauer's participation in this conspiracy presented overwhelming aggravating factors which relatively weak character testimony would not have outweighed.

Mr. Murphy's decision to emphasize Mr. Bauer's cooperation as the primary mitigating factor was the product of sound trial strategy and reasonable professional judgment.  By pursuing this strategy, Mr. Murphy emphasized the one mitigating factor that could result in a sentence below the 30-year mandatory minimum sentence, and kept the government from bringing forth additional aggravating evidence.  The court concludes that Mr. Bauer has failed to establish both the performance and the prejudice prong of <u>Strickland</u> on his claim that Mr. Murphy was ineffective for failing to call mitigation witnesses at sentencing.  It is recommended that Mr. Bauer's request for relief on this basis be denied.

## CONCLUSION

The court recommends that Mr. Bauer's request for relief under 28 U.S.C. § 2255 be denied in its entirety based upon the above findings of fact and conclusions of law.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1),

31

unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require *de novo* review by the district court.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

    Dated September 9, 2008.

                    BY THE COURT:

                    /s/ *Veronica L. Duffy*

                    VERONICA L. DUFFY
                    UNITED STATES MAGISTRATE JUDGE